[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION AND JUDGMENT OF MARITAL DISSOLUTION
The plaintiff-wife commenced this action for dissolution of the parties' marriage on the grounds of irretrievable breakdown. The writ and complaint were returnable to court on March 29, 1994, and simply claimed a dissolution and other equitable relief At trial on January 27, 1997, the parties stipulated that they would proceed on the Cross Complaint submitted by the defendant under date of May 26, 1994. They further stipulated that neither party requested an order of alimony,[1] and that neither party requested an award of attorney's fees. The remaining cross claims focused on the equitable division of marital property and thus mirrored the claims originally brought by the plaintiff. At the time of trial, the plaintiff requested the restoration of her maiden name, Margie E.D. Hudson.
This matter had been released for trial on June 2, 1995: trial of the matter commenced on January 27, 1997 and the evidence was completed on August 6, 1997. The defendant husband was represented by counsel throughout these proceedings and at trial. The plaintiff wife was initially represented by counsel, but served as her own attorney at trial.
 I
From the evidence presented over multiple days of trial, the court finds the following facts:
The defendant married to the plaintiff, then named Margie E.D. Nelson, on August 22, 1987 in Windsor, Connecticut. The plaintiff has resided in this state since that time. Neither party has received state assistance during the course of the marriage, and no minor children have been born to the parties during this time. Financial issues have been a source of ongoing conflict throughout the marriage. The parties' incompatibility with regard to their financial responsibilities caused the conditions which led to the defendant's departure from the CT Page 8909 plaintiff's home where they had lived together, and led to the irretrievable breakdown of this marriage.
Upon their marriage, the parties resided at 130 Pine Lane in Windsor, a home that was solely owned by the plaintiff prior to the union. There was no reliable evidence from which the court could reasonably determine the actual value of this property at the commencement of the marriage. At that time, the parties co-signed a obtained a second mortgage "homequity" loan with a $40,000 line of credit from the East Hartford Credit Union, where the defendant was a member. The Pine Lane property was used as collateral for the loan. In the first year of their marriage, the parties used approximately $30,000 of this line of credit. Approximately $9,000 of this amount was expended for payment of outstanding bills, including a credit union loan and repayment of a loan from the plaintiff's mother; $5,000 was used for the down payment on a 1988 Lincoln Town Car which was driven by both parties; and $3,000 used to pay off the plaintiff's debt to her former husband. $2,000 was used to purchase a time-share in Newport, Rhode Island, which the parties are entitled to use one week a year, with the remaining amount financed through a loan agreement for which was signed by both parties and for which both remain liable. Approximately $2,000 was used to purchase a van and pay for the installation of a new engine. The remainder was used as follows: to pay household bills; to pay charge account balances maintained by the defendant;[2] to purchase a desk and a tiller; to purchase and install paneling, a deck, a ceiling, a shower, fencing, and a laundry room at the Pine Lane property. While the defendant claimed that family funds were also used to pay for installation of a new floor, and carpeting at the Pine Lane property, these items were in-fact paid for through insurance proceeds received after a fire damaged the property.
With the exception of the carpeting and the new flooring, the defendant and his friends contributed much of the labor for all of the improvements made at the Pine Lane property. The evidence did not permit the court to conclude the value of any specific contribution by the defendant, however.
In 1990, the parties utilized another $9,000 from their home-equity line of credit. Thereafter, the first loan was canceled, and a second, substitute home-equity loan in the amount of $39,000 was provided to the parties jointly by the East Hartford Credit Union Again, the plaintiff's Pine Lane property was used as collateral. From this account, they paid various CT Page 8910 bills including payments for the Lincoln Town Car, reimbursement to the plaintiffs mother for loans extended to the family, and college costs for the plaintiff's son. Neither party could fully or accurately report all of the expenditures made from this account.
The defendant left the Pine Lane property early in 1991, and he has lived elsewhere thereafter. Although the parties have been lawfully married for ten years, they have resided together as husband and wife for approximately a third of that time. After the defendant's departure, the plaintiff was solely financially responsible for the maintenance and support of her Pine Lane property. Prior to that time, the parties had pooled their income, and used this fund to pay household bills and to pay the first mortgage on the Pine Lane property. The parties shared reasonably equally in routine maintenance and household chores.
Prior to January 1995, both parties had contributed to payments on the home-equity loan, in approximately equal shares. Since that date, the defendant has made no payments against this loan. He has been paying $139 a month, or $32.08 per week for the Newport time share, and pays a total maintenance fee for this property each year in the amount of $600 per month, or $11.54 per week. Despite this evidence of recurrent loan and carrying charges for this property interest, the court finds insufficient basis for attributing any specific value to the time share.[3]
The plaintiff is forty-eight years old and in good health. She holds a bachelors's degree in nursing from the University of Connecticut, and she has been employed in nursing for most of her adult life.[4] From 1987 through 1993, the plaintiff was employed by CIGNA where she had achieved the position of Nursing Supervisor. Her compensation there, as a senior employee, was approximately $38,000 per year. During this employment, she contributed to a 401k retirement plan managed by CIGNA. She also contributed to a savings and investment plan managed by the company. These accounts achieved maximum value of approximately $9,000. She had taken some premature distributions from the retirement and savings plans to pay for her child's college expenses.
The plaintiff left her employment at CIGNA in October of 1993, as the result of downsizing and reorganization at that company which would have allowed her to remain employed there but in a lower-level position, having been demoted from supervisor to CT Page 8911 staff status for reasons beyond her control. For approximately one and one half years. the plaintiff remained unemployed, eligible for unemployment compensation and/or doing part-time work as a visiting nurse.[5] During this period, the plaintiff prematurely withdrew the remainder of funds from her CIGNA accounts. Also during this period to enhance her re-employability, she completed a masters in public health program that she had started at UConn during the early part of the marriage. The court finds that the plaintiff voluntarily used her retirement and savings accounts, as she was not disabled from work during this period. These funds were used without the knowledge or permission of the defendant, ostensibly to provide for living expenses.
In 1995, the plaintiff obtained a position at the State Department of Public Health, where she works as a health program associate administering an injury prevention program. She earns approximately $42,000 gross wages per year in this position, or approximately $798 per week, which the court finds to be her earning capacity. There was no evidence from which the court could determine the value, if any, to be attributed to pension benefits the plaintiff may have accumulated during her two year tenure with the State.
The property at 130 Pine Lane is currently valued at approximately $125,000. In December of 1996, the plaintiff refinanced this property, procuring a loan of $80,000. She incurred this debt alone, without the defendant's signature or involvement. On January 9, 1997, using this fund, the plaintiff retired the $39,000 home-equity loan the parties had obtained jointly in 1990, and she used $13,000 to reimburse her family for loans they had provided during her period of unemployment.
The defendant is sixty years old and in good health.[6] For over 37 years, he has been employed at Pratt Whitney for where he is now a skilled assembler of jet engines. The defendant earns approximately $49,000 gross salary per year, or $942 per week,[7] which the court finds to be his earning capacity.[8]
He plans to retire voluntarily in two years. The defendant's medical insurance plan, through this employer, costs approximately $6 per week, and union dues are approximately $8 per week. He also contributes to a medical payment fund (IMA PreTax R) and a life insurance plan (OSLI).
During the course of his work at Pratt Whitney the defendant has regularly and consistently caused, allowed and CT Page 8912 permitted weekly deductions from to be made from his paycheck for voluntary contributions to two retirement plans (401k Basic R and 401k Suppl R), the purchase of U.S. Savings Bonds, and a separate savings and/or retirement plan managed by through the American Eagle Federal Credit Union. From 1991 through 1996, after his separation from the plaintiff, the defendant prematurely withdrew approximately $37,500 from his retirement/savings accounts.[9]
He used these funds for unspecified purposes, for his own benefit and without the permission or knowledge of the plaintiff. As of May 1997, the defendant's remaining retirement/savings accounts, net of his pension, were valued at $18,300, although this asset is not set forth on the defendant's financial affidavit.
The defendant has maintained a separate pension fund through his employer. This plan, which will provide monthly payments upon retirement, had been initiated long prior to, but continued in force during, the course of the marriage. From the evidence presented, the court concludes that the total present value of the defendant's Pratt Whitney pension is approximately $161,360.[10] Of this amount, a value of approximately $100,500 accrued during the course of the marriage.[11]
 II
The court is of the opinion that the major cause for the breakdown of this marriage was the parties' mutual inability to agree concerning use of their incomes and sums obtained through loans against the plaintiff's home. The court finds that the defendant's failure to provide the plaintiff with essential information concerning the ongoing voluntary deductions from his paycheck contributed to the breakdown of the marriage between these two mature individuals. The court assigns to each party equal responsibility for the breakdown of the marriage.
In reaching its decision, the court has considered all of the requisite statutory criteria, together with the taxable consequences of the financial awards set forth below. The criteria considered include those factors specified in General Statutes § 46b-81 as the basis for a decision related to division of the parties' property: the length of the marriage, the causes for the dissolution of the marriage, the age and health of the parties, their station and occupation, amount and sources of income, employability, vocational skills, estate, liabilities, needs and opportunity for future acquisition of capital assets and income. CT Page 8913
In this case, the court applies the above factors by concluding that both parties are in relatively good health; that each is employed at capacity, earning a significant income and working for a venerable and stable employer; that although the defendant currently outearns the plaintiff by approximately fifteen per cent, he is far nearer the end of his useful work life; that although the defendant is fast approaching retirement age, the evidence presents no basis upon which the court can reasonably find that he will be required to retire from active employment with Pratt Whitney by age sixty-two, although he has planned to do so; that notwithstanding the plaintiff's superior education, the defendant has achieved many valuable years of experience in his technical field of employment and that he has long been a member of his union, making him eligible for other employment after he leaves Pratt Whitney. The court further finds that the plaintiff had the capacity to have earned significantly greater income than she actually obtained through part-time work during the period when she was unemployed from 1993 until the time of her re-employment in 1995; that each party wilfully depleted or exhausted his/her retirement funds and savings during the pendency of this action, at the expense of the other party who may lawfully have been entitled to a portion of retirement funds and savings accrued during the marriage; that as the plaintiff is some twelve years younger than the defendant, this discrepancy provides her with an enhanced opportunity to accrue earnings, retirement funds, capital assets and other savings from her earning career, which will likely extend beyond that of the defendant, notwithstanding the fact that his earning capacity is currently higher than hers. As to the length of the marriage, the court acknowledges that while their legal relationship has continued until the time of this decision, there are no issue of this marriage, and the parties in fact have been separated and living separately for approximately six and a half years, nearly twice the length of the time they spent living together as man and wife.
The court has also applied the principles set forth inO'Neill v. O'Neill, 13 Conn. App. 300, cert. denied, 207 Conn. 806
(1988). O'Neill v. O'Neill establishes the proposition that an equitable distribution of property should take into consideration contributions made to a marriage other than those related to financial support. O'Neill v. O'Neill, supra, 13 Conn. App. 311. "A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to CT Page 8914 devote substantial effort to paid employment which, in turn, enables the family-to acquire tangible marital assets." Id., 311. After review of all the evidence presented, the court finds an inadequate basis for assessing the monetary value of any of the building improvements made to 130 Pine Lane during the course of the marriage. The court concludes that insofar as the defendant contributed to the construction of a deck, installation of other features, and repairs, he was entitled to make good use of these improvements while he resided at that property. The court finds that the parties shared homemaking responsibilities in fairly equal shares while they occupied 130 Pine Lane together. Therefore, in this case, the court assigns no specific monetary amount to either party's O'Neill contributions.
During the course of the marriage, the parties acquired several "assets". They include the improvements in the property at 130 Pine Lane, as discussed above; the retirement and savings accounts maintained through their employers; the increment in the defendant's pension; motor vehicles; and the Newport time share. As with the other assets, Connecticut cases have long acknowledged the trier of fact's ability to assess and establish the value of certain income and benefits, such as pension income, that will be received in the future. Accordingly, Kraftick v.Kraftick; 234 Conn. 783, 799-804 (1995); establishes that pension benefits earned through the course of the marriage can be reduced to a present value and considered for distribution at the time of dissolution.
The plaintiff urges the court to use a mechanistic model in distributing the marital property and assets pursuant to §46b-81, based on the parties' exact financial contributions to their marital assets and debts, the defendant's myriad payroll deductions, and the plaintiff's assiduous efforts in paying down the home-equity loans which have been placed upon the Pine Lane property. She asserts that the court is able thereby to "trace" the share of those extant assets to which each is now entitled, and to assign responsibility for accumulated debt, including the $80,000 home-equity loan acquired long after the parties separated. The court has declined the opportunity to utilize this approach in meeting its obligation pursuant to § 46b-81. No evidence was presented at trial from which the court could determine applicable discount and/or inflation rates for use in evaluating the parties' acquisition of marital assets or participation in indebtedness during the course of their marriage. Furthermore, the use of such models is discouraged in like cases. "`In family CT Page 8915 matters, the court exercises its equitable powers. The balancing of equities is a matter which falls within the discretion of the trial court. . . . For that reason, equitable remedies are notbound by formula but are molded to the needs of justice. . . ."' (Emphasis added; internal and external citations omitted.)Oneglia v. Oneglia, 14 Conn. App. 267, 271-272 (1988).
Some computations are appropriate in this case, however. As the evidence discloses that defendant withdrew approximately $37,500 from his retirement and savings accounts during the course of the marriage, and as he currently maintains a balance of approximately $18,300 in those accounts, the court is able to determine that the defendant possessed approximately $55,800 in retirement and savings accounts during the marriage. The court was presented with insufficient information from which the court could conclude when these funds were acquired. However, it is noted that the defendant has a 37-year work history with Pratt 
Whitney, were the accounts were held, several times the length of me marriage. As the court cannot precisely determine what portion of these accounts had accrued prior to the parties' marriage in 1987, the court determines that $18,600, approximately one third of he accumulated amount, represents a marital asset.
The parties presented insufficient reliable evidence from which the court could conclude the net value of the plaintiff's home at 130 Pine Lane at the time the parties married. Accordingly, the court cannot determine the amount of any increase or decrease that may have affected this asset during the course of the union. The court concludes, however, that the entire $9,000 that had accrued in the plaintiff's CIGNA retirement and savings represented a marital asset, given the commencement of her employment with this corporation at approximately the time of her marriage.
As noted, the court has determined that the defendant accrued approximately $100,500 in pension funds during the course of the marriage. These funds are not accessible until and unless the defendant retires from his employment with Pratt Whitney.
The court has evaluated each party's claims to marital property, tangible and intangible, including property which has been held jointly or singly during the course of the marriage, or in which each has a current interest. The court has considered, as noted above, the primary assets which each brought to the marriage, being the plaintiff's home, the defendant's Pratt 
CT Page 8916 Whitney pension, and the defendant's savings and retirement accounts maintained through his employer. The court has further considered each party's use of assets during the marriage, as noted above, and the likelihood that the plaintiff will, in the future, have a significantly enhanced ability to acquire income and accumulate additional assets, due to the relatively advanced age of the defendant. The court finds that each party has unnecessarily used and dissipated marital assets for his or her own purposes. The plaintiff was able to work and earn income during the period following her employment at CIGNA, which would have preserved the $9,000 total retirement account through that employer, and the defendant's generous Pratt Whitney salary minimized or obviated any necessity for him to invade his savings and retirement accounts by $37,500, as was done.
The court declines to accept the defendant's argument that the plaintiff left CIGNA voluntarily, but finds instead that her job there was effectively eliminated by the management of that corporation. The plaintiff admitted, however, that had the plaintiff remained at CIGNA in her reduced capacity, she would have earned approximately the same amount as she had received when employed as a supervisor. Therefore, while the court does not find that the plaintiff avoided employment in an effort to obtain support from the defendant after her departure from CIGNA, the court must consider these circumstances when evaluating the parties' entitlement to a distribution of assets pursuant to § 46b-82.[12]
With regard to the value of the home-equity loans that were jointly undertaken during the course of the marriage, the court finds that the majority of the funds thus obtained were used by the parties in approximately equal shares to pay their personal and family expenses or to procure family transportation. One fourth of this amount was used to provide improvements to the plaintiff's home and to purchase the time share. From 1987 through 1995, the parties made payments against the home-equity loans in approximately equal shares. Under these circumstances, court finds it fair and appropriate for defendant to reimburse the plaintiff for approximately one third of the value of the second home-equity loan, or $13,000, representing amounts that were expended for his purposes, for which he has not yet made reimbursement, and for which the plaintiff will not, under the terms of this agreement, retain a specific benefit. The plaintiff shall remain responsible for payment of the remainder of the original loans, and for the $40,000 increment to the loans, which CT Page 8917 represents amounts that were expended for her purposes and to improve and retain her home.
Accordingly, the defendant shall be required to pay the plaintiff $13,000, his share of the original $40,000 home-equity obligations. The defendant also shall be required to pay the plaintiff an additional $3,200, representing one third of the net marital assets accrued in his Pratt Whitney savings and retirement accounts, after deducting the $9,000 voluntarily expended by the plaintiff from her own CIGNA accounts.[13] The defendant has adequate assets in his savings and retirement plans, separate from his pension, to cover these obligations. The court has ordered a schedule for payment that accommodates the defendant's advanced age, expected work life, and the plaintiff's anticipated continued career growth and remuneration through her employment with the State of Connecticut and/or as a registered nurse with an advanced degree.
The plaintiff shall be entitled to retain the property at 130 Pine Lane, and she shall have the advantage of all improvements made to that property during the course of the marriage, but as indicated above, she shall be responsible for payment of the current loan outstanding against that property. The defendant shall be permitted to retain the Newport time share, with its joys and the vicissitudes associated with its financial obligations.
The court has found that the defendant accumulated approximately $100,500 in his Pratt Whitney pension during the course of the marriage. In view of the relative ages of the parties; the length of time the parties have been married; their equal responsibility for the breakdown of the marriage; the plaintiff's superior ability to accumulate pension funds in the future and her retention of 130 Pine Lane; and accommodating the likelihood that the defendant will not be able to make substantial contributions to this pension in the future; that he will have relatively immediate need of his pension funds; but that the marital asset accumulation represents only a portion of his pension funds; the court awards the plaintiff forty per cent of this marital asset, or $40,200, to be distributed as pension funds when the defendant retires.
The court finds that it has jurisdiction over the matter, and that the allegations of the cross complaint have been proved to be true. CT Page 8918
WHEREFORE the marriage of the parties is hereby dissolved, and the following ORDERS shall be implemented.
 III ORDERS
130 PINE LANE PROPERTY:
 This property shall remain the plaintiff's, to be her sole and separate property, without any claim of ownership or interest by the defendant.
HOME-EQUITY DEBT ATTACHED TO 130 PINE LANE PROPERTY:
 Any current debt attached to the property at 130 Pine Lane, identified as home-equity debt or second mortgage debt, shall be the sole responsibility of the plaintiff, and the defendant shall have no responsibility for payment on these loans.
NEWPORT TIME-SHARE:
 The defendant shall have the time-share property interest in Newport, Rhode Island as his sole and separate property, and he shall be entitled to all of the privileges attendant that property, as well as obligated to pay all of the costs, fees, charges, taxes and other financial responsibilities attendant that ownership. The defendant shall hold the plaintiff harmless from any obligation to make any payments related in any way to this time share property or financial obligations for this property. Upon receipt of this order, the defendant shall immediately notify any and all lien-holders of this court's order, and he shall use all reasonable means to remove the plaintiff's name from any financial obligations related to ownership of this property.
CASH PAYMENTS DUE FROM THE DEFENDANT TO THE PLAINTIFF:
 The defendant shall pay to the plaintiff the sum of $16,320 ($13,000 + $3,200 = $16,200) as a distribution of property. Payments shall be made from the defendant to the plaintiff at the rate of $200 per month, payable on the 15th of each month commencing November 15, 1997, and continuing until the amount owed has been paid in full. Payments shall be transmitted by certified return-receipt U.S. mail. The plaintiff shall be entitled to accrue simple statutory annual interest on any unpaid installments. The defendant may accelerate these payments CT Page 8919 without penalty.
 This obligation shall be bound by a mortgage executed by the defendant providing the plaintiff with a secured interest in the Newport time share property. The mortgage note shall be prepared by the defendant through his counsel within sixty days from notification of this judgment. The defendant shall transmit the mortgage not to the plaintiff by certified return-receipt U.S. mail. The defendant shall not be permitted to use the Newport time share property to secure further debt. The defendant shall not sell, transfer or otherwise divest himself of the Newport time share property without court order.
PRATT WHITNEY PENSION:
 The plaintiff shall be entitled to the value of $40,500 of the defendant's pension at Pratt Whitney, representing forty per cent of the $100,500 in this pension fund which accumulated during the course of the marriage. This $40,500 shall be secured by a qualified domestic relations order, or some equivalent, which can be utilized to allot the plaintiff's share of this asset, and which will "presently divide or assign the pension benefits between the spouses." (Citations omitted.) Kraftick v. Kraftick, supra, 234 Conn. 803. The defendant shall be responsible, through his counsel, for the timely and effective drafting and perfection of that qualified domestic relations order or its equivalent. If the defendant's retirement account administrators cannot accommodate such a qualified domestic relations order or its equivalent, the parties are ordered to bring this fact to the court's immediate attention, so that alternative, equitable orders may be entered in this matter.
AUTOMOBILES:
 The defendant should transfer to the wife his interest in the 1988 Lincoln Town Car, which shall be her sole and separate property.
 The defendant shall cause the Van to be transferred from joint ownership with the plaintiff, to become his sole and separate property. The plaintiff shall prepare the transfer paperwork required by the Department of Motor Vehicles, and shall submit this to the defendant by return receipt U.S. mail. Upon receipt, the defendant shall become responsible for completing this transfer, and he shall promptly provide the plaintiff, by certified return receipt U.S. mail, with documentation from the Department of Motor Vehicles and/or his local property taxing authority which establishes that he and he alone is responsible for paying taxes related to the vehicle. CT Page 8920
CREDIT CARDS:
 The defendant shall be solely responsible for payment of any charges, fees, costs and interest accrued upon Visa Account 4039-254-671-575 issued by American Federal Credit Union Bank, and he shall hold the plaintiff harmless from any obligation to make payments on this account. Upon receipt of this order, the defendant shall immediately notify this creditor of this court's order, and he shall use all reasonable means to remove the plaintiff's name from any financial obligations related to the use of this card.
LIFE INSURANCE:
 The defendant shall purchase and maintain life insurance in the amount of $75,000 to protect the plaintiff from the financial obligations imposed upon him by the court through this decision. The defendant shall provide a copy of this insurance policy and declarations page available to the plaintiff on an annual basis, upon receipt of written request from her. All communications between the parties concerning this issue, the request for policy information and the provision of policy documentation shall be made through certified return-receipt U.S. mail. Upon satisfaction of all provisions of all financial obligations set forth herein, the defendant shall be permitted to cancel this policy of insurance.
ALIMONY:
 The defendant shall pay the plaintiff $1 per year, modifiable only upon a satisfactory demonstration to the court that the defendant has failed to properly comply with court-ordered distribution of property set forth above. This obligation shall not be dischargeable in any bankruptcy proceedings, as it is intended to ensure the enforcement of the equitable orders entered herein.
ATTORNEY'S FEES:
 At the stipulation of the parties, the court will not award attorneys fees to either plaintiff or defendant in this matter.
CHANGE OF NAME:
 Henceforth the plaintiff shall be known as Margie E.D. Hudson, which name she may lawfully use. CT Page 8921
BY THE COURT, N. Rubinow, J.